Good morning. Richard Levy for the Appellant Magdaleno. This is the habeas case involving whether the preliminary hearing testimony was properly used at trial. I have two main points. First, it's not necessary for this Court now to address whether the preliminary hearing provided a sufficient opportunity for effective cross-examination because the case can easily be resolved on the alternative ground that the government made insufficient efforts to locate the witness almost. The government, the State, knew at least by October 1st, 2002 that there was going to be a problem because she did not show What clearly established Federal law renders the California Court of Appeals' contrary determination unreasonable? On the reasonable efforts? On the unavailability. That would be the Crawford case. No, no, no. Unreasonable. On the point that you're just now making, that the efforts were not reasonable. It's, Barbara, it's implied, I would say it's implied by the fact that the witness has to be unavailable. How do we know the witness is unavailable? That's fleshed out by the courts of appeal. I can certainly understand why you have a legitimate position with respect to the lateness of the efforts and whatever. But that's not our questions. I mean, we don't have it straight up. Our question is whether the California Court of Appeal, which found that the efforts sufficed, is plainly wrong under clearly established Supreme Court precedent. Okay. Judge Romer, given that the witness has to be unavailable, the question, I guess you're asking, is it reasonable to say that these efforts of Investigator Barrera were reasonable? Or can you say, I believe that's the question, can you say that the court of appeal was unreasonable in finding reasonable diligence? And the answer is yes. The reason is the Court's focus, the Court's tunnel vision. The analogy given in the brief, I think, is apt about the law student. The law student hasn't cracked open a casebook or a horn book all semester. Three days before finals, he buys a couple of Gilberts and, in a nutshell, and works 18 hours a day. No one would reasonably say that this guy was diligent. Sure, he worked 18 hours a day, but you have to look at the fact that he did nothing beforehand. And this Court's recent opinion in Jackson v. Brown, which is discussed in the reply brief, makes that same point. The government did nothing for months until they said, aha, we're going to have a problem here. We'd better show some efforts. You know, if all they'd done was send out a process server with a subpoena the day before she was supposed to show up in the courtroom and she didn't show up, then your argument would be much stronger. As it is, we have to apply 2254 deference to the state court determination that Investigator Barrera's search for Olmos was reasonable and thorough. So it has to be not just something we might disagree with, but an unreasonable determination by the state court. And considering that they did make efforts over a few weeks, I don't see quite how we do that. It's the Court found reasonable efforts, and I would not dispute Judge Kleinfeld, that Barrera's efforts were reasonable in the context that he was given the file three weeks beforehand and he was told, go ahead, you've got to do something. He did make a lot of effort in those three weeks. But the tunnel vision is, what about the prior four months? They knew she didn't show up. How many weeks earlier should he have started in order to meet the federally required reasonableness standard? He started three weeks early. Six weeks? When they knew that she did not show up to honor a subpoena. Six months? That was four and a half months. Excuse me. Six months? Well, they did not know in six months, Judge Fernandez. Well, they knew she didn't show up the second time, was it? I'm sorry? What was the first time she didn't show up when the Court issued its bench warrant? October 1st, 2002. Right. And that's when the Court issued the bench warrant. And I have to apologize, the reply brief says October 11th. The opening brief has it right. Do you have something to show that she could have been found with more effort? What I'm thinking of is I had another case about this issue a few months ago, and it turned out that the missing witness was running a well-known and prominent house of prostitution in a neighboring town, and all the police knew about it. With this one, as far as I can see, nobody, she hasn't popped up and said, I'm here, I was here all the time. And no affidavit has been filed to show where she is or that she's still alive or that she's still available. I might have missed it because. I do have that in touch right now. The investigator, Guerrero, admitted that he spoke to the next-door neighbor sometime in February 2003, and the neighbor said she hadn't seen Olmos for some three months. That's ER 175. Now. That's not exactly what I'm looking for. What I'm looking for is evidence showing that Olmos is, in fact, alive and locatable. Yes. Yes. That's it. She was available three months before the investigation. No, I hadn't seen her for three months does not show that she's alive and available. She came to sentencing. She did come to sentencing, so we know after the fact. But if the neighbor had seen her, the next-door neighbor had seen her beyond three months ago, that means for that window between four and a half months and three months, she was living there. If only the government had initiated proceedings once they knew that she was dishonoring the subpoena, they could have gone to the house and they would have found her. And that's the evidence I think you're referring to, Judge Kleinfeld. How'd they get her for? Is there some evidence of where she was at the time of trial? No. No. All we know is all we can infer is that she was in the area because she obviously knew to come to sentencing. She knew when the sentencing was. Why is that all we can infer? Well, I think. I think the California Court of Appeal answered that very nicely. So what do you mean it's all we can infer? She could have been in Timbuktu. We don't know where she was. Well, sure. She could have been. But she was keeping in touch enough that she knew to go to sentencing. All we can infer is not that she was on hand, is it? Right. Okay. I agree with that, Judge Fernandez. We can't say for sure that she was in Los Angeles. But that's the problem, is it not? Because we're dealing with, we're dealing, again, on Section 2254 review. Isn't that a problem? Under Jackson against Brown. If it were all we could infer, that would be something else, maybe. Well, the example I gave to Judge Klinefeld, if they'd been on the ball, they could have gone to her house in that window. Are you saying that to use unavailability under Crawford, they have to babysit the witness? Not at all. From the time of the crime to the time of the trial? Not at all. But just as Jackson against Brown said, you can't sit on your hands until it's too late. In Jackson against Brown, they sat on their hands for several months. But this case is even stronger than that, because in Jackson against Brown, they sent out a police officer and said, will you handle this? It turned out the police officer was too busy. I remember the prosecutors basically rounding up their witnesses immediately before trial, not even as long as three weeks. But when, to go back to your earlier example, Judge Klinefeld, if they had no inkling there would be a problem, and they'd serve the subpoena a few days before trial, and she doesn't show up, and they, let's say this is in February. They serve the subpoena for the trial in February. She doesn't show up. That's the time to make the efforts. But here, they knew months in advance. That's the problem. That's what makes this case similar to Jackson against Brown. Let me go on to my other point, prejudice. Now, this case absolutely makes difficult reading, not just the steam iron, but the whole incident, viewing the evidence supporting the conviction. The problem is the prosecutor chose to charge two crimes that carry very specific, narrow, specific intent, torture and mayhem. It's not enough to say this was an explosion of domestic violence, which we see happen all the time. If you've got a charge. Well, Magdalena himself told the police that he hit her, burned her, and poured alcohol over her and threatened her. I mean, that doesn't require anything from anywhere else. That's his own statement to the police, from which intent to do a good deal of damage can be inferred. The intent to harm, obviously. Absolutely, Judge Reimer. But for mayhem, is there an intent to permanently disable or permanently disfigure or permanently deprive the person of right? Well, if he poured alcohol on somebody and threatened the igniter, I would say that's fairly certain to be the certain and permanent. That's a critical point, though, Judge Reimer. He threatened, but he did not carry through. If anything, that shows he did not have the specific intent required of these crimes. The threat he made was to set himself and her and the house on fire. He didn't carry through that. The jury could infer just from his testimony that this was all a bluff, that this was just an explosion of domestic violence, but not enough for her. Okay. Then you combine that with contemporaneous eyewitness observations of her condition when she went to the police and to the hospital. Absolutely. And you can't infer anything? The cases say, cited in the opening brief, that although you cannot infer just from the nature of injuries the intent for torture and for mayhem, it's certainly circumstantial evidence. I'm sorry. Go ahead. It's certainly circumstantial evidence, and there's no dispute that she was grievously injured. But there are other crimes for grievous injury that do not require a very narrow specific intent. Did they find any tissue on the hammer or on the iron? I do not believe so. I don't believe that's in the record. They did find some blood, but it was not tested. They didn't test the blood? It did not, but we can assume whose blood it was. We can assume that it's her blood? Right. Right. I mean, I'm not challenging that. Why wouldn't hitting somebody on the – was the blood on the hammer or the iron or both? I'm sorry. I do not recall specifically. I cannot say. Why wouldn't hitting somebody on the skull with a hammer be sufficient to support an intent to – for mayhem? Because there has to be an intent to permanently disfigure or to permanently disable. If anything, his intent would – you know, most domestic abusers, their intent is to harm but not to leave any lasting marks so that they won't get in trouble. Hitting somebody on the head with a hammer? Yeah. Yeah. This was a grievous injury. There's no doubt about that, Judge Fernandes. And that would show any intent to lasting harm or any disfigurement, I take it? Not necessarily. Didn't her skull crack or something like that? Wasn't that part of it? Yes. There was evidence or there was testimony that there was a crack in the skull. But again – That's hardly pretty, is it? Because it's under her hair, you figure it's not disfiguring? Well, a crack in a bone would not be the kind of disfigurement that mayhem addresses. A crack in what? Would not be the kind of disfigurement that mayhem addresses. Did you say in a bowl? I'm sorry? Did you say in a bowl? I didn't hear that word. A crack in the skull, in the skull. The statute says permanent disability or disfigurement. And I think breaking somebody's head could reasonably be expected to cause permanent disability. The problem – I'm not arguing that there was insufficient evidence that the injuries after the fact could be viewed as sufficiently grievous or mayhem. Also, ironing their buttocks, you would think, with a hot iron. Right. There's no doubt this is a painful, painful reading. Also, you would expect some disfigurement of the buttocks from ironing them with a hot iron. As the California case is cited in the opening brief show, there has to be a distinction between, quote, an explosion of violence and a methodical, specific intent to achieve a further goal. He can be heavily punished for what he did. But they've got that. They've got that. I think there was a conflict in the evidence about whether it was dope or $25,000. So there was that intent. Not from her testimony, from her preliminary testimony in her statement to the police. And his admission to the police. His admission to the police was simply along the lines that this was an explosion. I mean, he threatened to kill. He said he questioned her about money. I mean. I'm sorry? He told the police he was questioning her about where the money was. Sure. Sure. And they had a dispute about that. And he told the police that there was a dispute the night before. But whether that, and I'm not arguing that there was insufficient evidence to reach this without almost his testimony. What I'm saying is her testimony was the substantial evidence that made it absolutely clear cut that this was torture and this was mayhem. And the other evidence was highly equivocal. Sure, the jury could possibly infer that because he had this dispute and because he was asking her that he was torturing her to get information. But he never said that. He, and that would require some inference. It seems like the question here is not whether it's merely circumstantial evidence or whether it's a direct admission of all the elements of the crime. The question here is whether there was, that you began this discussion of, is whether there's prejudice. And I wonder why the inference is not so compelling that there isn't. Because the possibility of an inference is not going to be enough, even under the correct standard, to save these first two convictions. It was her prelim testimony that made it absolutely clear, from her perspective, without adequate cross-examination, that this was torture and mayhem. Everything else, and her statement about the hospital, everything else was perfectly compatible with an explosion of domestic violence, as is quite common. So that's the prejudice. You know, the prosecutor's master of his complaint, he didn't have to charge a specific intent crime with these narrow, too specific intents. He could have charged, in addition to assault, he could have charged domestic violence, battery with great bodily injury, bodily injury enhancement. They're the ones who decided to charge this, hoping that she, her testimony would be admissible. Finally, I know my time is running out. I have to alert the court, and I'm sorry I did not do this in a 28-J letter. This Court, in Delgadillo v. Woodford, 527 F3, 919, did state that, without any analysis, that preliminary hearing testimony was adequate, that that provided an adequate opportunity for cross-examination. I believe that case is not binding on this Court, for the same reason as Jackson v. Brown's discussion, because there was no analysis of it. It was just thrown out. It's not clear that anyone even raised it as an issue. And why wouldn't it be? The way I remember preliminary hearings, I only defended, didn't prosecute. They're great. It's the one time when you can ask a question you don't know the answer to. It's a discovery deposition. Except in California now, they're absolutely statutorily forbidden to use it for discovery. So that really limits. Yeah, so are we. But as a practical matter, it means you can ask questions that you don't know the answer to because the jury doesn't hear it as long as the witness shows up. Well, you're saying just plain, well, sure. If the attorney, whether wounded or not, puts aside the statutory conditions. Well, you just ask a lot of questions to find out whether there's probable cause to bind the person over. And that way you find out everything the witness has to say. It is likely nowadays, given the statute, that the judge would cut them off so quickly that they would not get very far with that discovery, with that method of discovery just plain, well, given the statutory prohibition. I do have 30 seconds, so if I could save my time. Sure. Mr. Dale. Good morning, Your Honors. David Medea to respond. In this case, the victim's preliminary hearing clearly was testimonial under Crawford, but it was admissible because the witness was unavailable and because there was a prior opportunity. Counsel, could you talk slower? I can't understand you. I'm sorry. Let me go straight to the unavailability discussion. Really? I can't understand the words. It must just be me. Okay. I'm going to go straight to the unavailability discussion. The prosecution's due diligence in this case. Counsel stated basically that there was no excuse for not trying to find this witness earlier than the investigator did. But, however, in this case, this case was continued a number of times. Even though a body attachment was issued on October 1st for this witness, there was no reason for this witness actually to be in trial until the end of January at the earliest. In this case, the prisoner actually got two different counsels during the course of the month that followed. So essentially there was no reason whatsoever for this witness to be found until trial was to begin. And they actually started looking for her almost a month before, about three, a little over three weeks before. And so you really can't reasonably say. They began looking right after New Year's? We don't know exactly what date in the record because there was a first investigator that actually did try to find this witness. But it's not clear exactly when he actually started and what information he actually found. What we do know is there was another investigator that actually began on February 3rd. And so he started to find her. The trial at this point was scheduled to begin on February 22nd, I believe. So we have almost three weeks before trial began that the investigator was actually trying to find this witness. And I just want to briefly mention the case of. And remind me what he did. Well, it was quite extensive. He went to unknown addresses. There were at least two that he found. He went to where he thought she was staying. She was not there.  He spoke to neighbors. She hadn't been seen since October. There was an employment address on file. I contacted that employer. She had not worked there for months either. He also contacted a number of state authorities, county authorities, Border Patrol, state prisons, county jails, a number of local facilities where she might be. And he did this multiple times as well. He went the first week, came back the second week, and went to almost all the addresses again. Left a card and a subpoena copy. Where did she turn out to be? I don't believe we know that. She showed up for sentencing, so she turned out to be alive. She was alive, but we don't know if she was even in the state during this time. As the Court of Appeals said, she might have been in Mexico. She was from Mexico originally, I believe. She might have been anywhere. We just don't know where she was between October and February. Did anyone bring out at the sentencing where she'd been? I don't believe so. Is there any affidavit or anything that shows how she got found and produced at sentencing? No, I don't believe there is. I don't believe the prosecution actually found her after that point. I think she just came out and went to court. I don't even know if the prosecution knew that she was going to be there. She just showed up? As far as we know, I believe so. She's probably given her statement multiple times in this case. She'd given it to two officers. She had come to the preliminary hearing. This is obviously a terrible ordeal this woman suffered. To actually go through all this, it's understandable to think that she had given her statement enough times and that she wouldn't feel the obligation necessarily to be present whenever somebody needed her. If I could just briefly speak to a prejudice in this case. There was absolutely enough evidence here, even without the preliminary hearing testimony, to show the intent of the petitioner committing these crimes. As had been brought up before in the briefs, upon his own statements, he pretty much admitted to causing each of these injuries. You can infer from the injuries themselves how they actually happened, the special weapons he used, what the intent was. Is it true that there was no tissue found on the hammer or the iron and that there was blood found on the hammer that was presumed to be hers but was not tested? That's correct. And I believe the reason for that is, of course, there was no challenge to the fact that she actually suffered this injury and the fact that the hammer was the instrument. So there really wasn't an issue in this case. But there was blood found on the hammer. We just presume that it was actually hers. Unless there are any questions, I would submit them to you. I don't think so. Thank you. Thank you. Mr. Leahy. Just to go back to Judge Reimer's question for AEDPA, what's the basis of good faith effort to obtain the witness's presence? That would be Barber v. Page, Judge Reimer, which says a witness will be deemed unavailable only if, quote, the prosecutorial authorities have made a good faith effort to obtain his presence at trial, unquote. So it is firmly grounded for purposes of AEDPA. I don't question that. My question was, under what authority is California Supreme – California Court of Appeal determination unreasonable? Because it said – it found that there was a good faith effort. By this investigation? Yes. And what makes it unreasonable is just the tunnel vision looking only at what he did. Okay. All right. I guess we understand. Thank you very much, both of you, for your argument. The matter just argued will be submitted.
judges: Fernandez, Rymer, Kleinfeld